**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| JOE HAND PROMOTIONS, INC., *Plaintiff*, | ) | Case No. 3:20-cv-382 |
| v. | ) | Judge Travis R. McDonough |
| JAMES H. GRIFFITH, Jr., d/b/a CJ'S SPORTS BAR, and LISA LESLEY *Defendants*. | ) | Magistrate Judge H. Bruce Guyton |

---

**MEMORANDUM OPINION**

---

Before the Court are Plaintiff Joe Hand Promotions, Inc.'s ("Joe Hand") motion for partial summary judgment (Doc. 39) and Defendants Lisa Lesley and James Griffith, Jr.'s motion for summary judgment (Doc. 41) and motion for sanctions (Doc. 48). Defendants Lesley and Griffith's motions motion for summary judgment is **GRANTED** (Doc. 41). Because the Court grants Defendants' motion for summary judgment, Plaintiff Joe Hand's motion for partial summary judgment (Doc. 39) and Defendants Lesley and Griffith's motion for sanctions (Doc. 48) are **DENIED**.

## I. BACKGROUND

James Griffith, Jr. owns and operates CJ's Sports Bar ("the Bar") in Kingsport, Tennessee. (Doc. 40-7, at 17.) Lisa Lesley is an employee of the Bar. (*Id.* at 49.) Joe Hand is a business that licenses sports and entertainment programming to commercial establishments. (Doc. 40, at 1.)

On August 26, 2017, Floyd Mayweather and Conor McGregor engaged in a prizefight that was broadcast live ("the Event"). (Doc. 41-1, at 3.) Showtime, Inc., owned the copyright to the Event and made the Event available for non-commercial streaming from its website. (Doc. 40-2, at 49.) Nearly three months later, on November 21, 2017, Joe Hand entered into an agreement with Showtime ("the Agreement"), in which Showtime purportedly granted Joe Hand "sole and exclusive Commercial Rights" in the Event; however, despite this ostensibly sweeping phrase, the Agreement defined these rights as "[t]he exclusive right to distribute and publicly perform the Event live on August 26, 2017[,] to Commercial Premises in the Territory." (*Id.* at 46.)[1] The Agreement also contained an "Enforcement of Rights" provision:

> Insofar as [Showtime] is concerned, [Joe Hand] shall have the right and standing, as exclusive assignee, to assert independent claims, solely in the name of [Joe Hand], for copyright infringement under the copyright laws of the United States . . . solely relating to the unauthorized exploitation of the Commercial Rights in the Event in the Territory.

(*Id.* at 47.) The Agreement further stated that Joe Hand

> has the exclusive right in the Territory to take enforcement measures, prosecute and commence legal actions with respect to any unauthorized exploitation of the Commercial Rights [and that Showtime] hereby assigns and grants to [Joe Hand] such rights, interests or powers in the Event as are held by [Showtime] solely to the extent necessary . . . to enable [Joe Hand] to enforce and to initiate legal proceedings . . . for copyright infringement.

(*Id.* at 46.) Joe Hand purportedly licensed the Event to commercial establishments and based its rates upon the attendance or seating capacity of the commercial establishments sublicensing the Event. (*Id.* at 28.) For an establishment with a seating capacity of 101 to 150 persons, Joe Hand charged $5,200 to license the Event. (Doc. 40-3, at 1.)

[1] Obviously, by the date of the Agreement, it was impossible for Joe Hand to do anything with the Event "live" on August 26, 2017.

Prior to the Event, the Bar posted or shared multiple posts on its Facebook page promoting the Event and encouraging individuals to buy tickets. (*Id.* at 7–12.) Lesley rented the Bar on the night of August 26, 2021, for $1,000, collecting six dollars each from patrons at the door, and purchased the program from Showtime's website for viewing at the Bar. (*Id.* at 18–20; Doc. 41-1, at 3; Doc. 40-2, at 5; Doc. 40-7, at 27.) Lesley did not, however, license the Event for the Bar through Joe Hand. (*See* Doc. 47, at 9.) Instead, Lesley used an HDMI cable to hook up her computer—which she used to buy and stream the Event for $99—to a television so patrons could watch the Event together on a larger screen. (*Id.*) No one from the Bar contacted Joe Hand about broadcasting the Event. (Doc 41-1, at 3.) Griffith received money from the food and beverages sold during the Event but did not receive any of the door charge collected by Lesley. (*Id.*; Doc. 40, at 5.)

On August 26, 2020, Joe Hand instituted the present action for copyright infringement and internet piracy. The Court previously dismissed Joe Hand's claim for internet piracy, (*see* Doc. 31), and a single count of copyright infringement remains. The parties have fully briefed their cross-motions for summary judgment (Docs. 40, 41, 47, 49), and the motions are ripe for adjudication.

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

The standard of review when parties file cross-motions for summary judgment is the same as when only one party moves for summary judgment. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). When there are cross-motions for summary judgment, the court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id*. In considering cross motions for summary judgment, the court is "not require[d] . . . to rule that no fact issue exists." *Begnaud v. White*, 170 F.2d 323, 327 (6th Cir. 1948).


Case 3:20-cv-00382-TRM-HBG Document 54 Filed 10/20/21 Page 4 of 11 PageID #: 593

## III. ANALYSIS

Lesley and Griffith assert they are entitled to summary judgment on Joe Hand's copyright-infringement claim because Joe Hand did not own the copyright to the Event when it was displayed at the Bar. (Doc. 41, at 1.) Further, Griffith asserts that he did not benefit financially from the infringement and, therefore, cannot be held vicariously liable. (*Id.* at 9.) In evaluating Lesley and Griffith's motion, the Court draws all inferences in favor of the nonmovant, Joe Hand. *See Matsushita Elec. Indus.*, 475 U.S. at 587.

Lesley and Griffith contend that Joe Hand did not own the copyright at the time the Bar broadcasted the Event, and, therefore, it lacks standing to bring an action for copyright infringement. Lesley and Griffith claim that either (1) the Agreement between Joe Hand and Showtime, the copyright owner, was merely an assignment of a right to sue, or, alternatively, that (2) the Agreement was not retroactive to the date of the Event. (Doc. 41-1, at 7.)

To succeed on a claim for copyright infringement, the party alleging infringement must prove ownership of a valid copyright. *Bridgeport Music v. WM Music Corp.*, 508 F.3d 394, 398 (6th Cir. 2007); *see also* 17 U.S.C. § 201(d)(2). Ownership can be transferred through "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright." 17 U.S.C. § 101. Once ownership is established, section 201(d) provides that "[t]he owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner." 17 U.S.C. § 201(d)(2). This includes the right to bring an action for infringement. *See* 17 U.S.C. § 501.

The Sixth Circuit has stated that even though federal law governs copyrights generally, "state law is not displaced merely because [a] contract relates to intellectual property." *Cincom*

*Sys., Inc. v. Novelis Corp.*, 581 F.3d 431, 437 (6th Cir. 2009). So long as a federal copyright policy is not affected, "state contract law will govern the interpretation of a license because a license is merely a type of contract." *Id.* (citing *In re CFLC*, 89 F.3d 673, 677 (9th Cir. 1996)); 5 PATRY ON COPYRIGHT § 129 (2021). The same framework applies to the analysis of an assignment agreement because it, too, is a type of contract. Because Lesley and Griffith's argument poses a question of contract interpretation, the Court will look to Tennessee law to determine whether the Agreement in this case was retroactive to the date of the Event, keeping in mind that "[a] copyright license [or assignment] must be construed in accordance with the purposes underlying federal copyright law." *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d 1042, 1051 (9th Cir. 2020); *see also Design Basics, LLC v. Chelsea Lumber Co.*, 977 F. Supp. 2d 714, 730 (E.D. Mich. 2013).

The language of the contract is the starting point for ascertaining the parties' intent. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). "It is well-settled that the language used in a contract must be taken and understood in its plain, ordinary, and popular sense." *Fisher v. Revell*, 343 S.W.3d 776, 779 (Tenn. Ct. App. 2009) (citing *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W. 578 (Tenn. 1975)). "Provisions in a contract should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract." *Id.* (quoting *Guiliano v. Cleo, Inc.*, 995 S.W. 2d, 88, 95 (Tenn. 1999)). Contract interpretation is typically a question of law. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002).

There is no dispute that Showtime is the original owner of the copyright to the Event. (Doc. 40-2, at 1.) However, Lesley and Griffith assert that the Agreement between Showtime

and Joe Hand does not constitute a valid transfer of an exclusive right under the Copyright Act. (Doc. 41-1, at 7.) Among the exclusive rights granted to copyright owners are the rights to "reproduce the copyrighted work in copies or phonorecords," "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending," and, in the case of "motion picture[s] and other audiovisual work[s], to display the copyrighted work publicly." 17 U.S.C. §§ 106(1), (3), (5). Among the rights conveyed from Showtime to Joe Hand is "the exclusive right to distribute and perform the Event live on August 26, 2017 to Commercial Premises in the Territory." (Doc. 40-2, at 46.) The right to "distribute and perform" the Event is within the bounds of the Copyright Act, 17 U.S.C. § 106, and the transfer was conducted through a permissible method. *Id*. § 101. Consequently, the Court will assume, for the purposes of this motion, that the Agreement assigned Joe Hand an exclusive right under the Copyright Act, and, with it, the accompanying enforcement rights.

Nonetheless, the question remains whether Joe Hand owned any exclusive right at the time of the live presentation of the Event in August 2017. "The legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement . . . committed while he or she is the owner of it," 17 U.S.C. § 501(b), so the determinative question here is whether Joe Hand owned the copyright at the time of the Event. Lesley and Griffith assert that, even if Joe Hand owns an exclusive right or rights under § 106, it did not own these rights at the time of the Event because the Agreement was not executed until November 2017—nearly three months after the Event was broadcast. (Doc. 40-2, at 46; Doc. 41-1, at 7.)

The Agreement provides that Joe Hand possesses "[t]he exclusive right to distribute and publicly perform the Event *live* on August 26, 2017 to Commercial Premises in the Territory." (Doc. 40-2, at 46 (emphasis added).) "Live" is defined as "[b]roadcast while actually being

performed; not taped or recorded." THE AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1024 (4th ed. 2000) (emphasis added). The use of "live" therefore indicates that the Agreement was meant to reach back to August 26, 2017, the date the Event was occurring and broadcasted live.

However, the parties' stated intent in forming this contract does not square with the purposes, and the text, of the federal Copyright Act, which "does not permit copyright holders to choose third parties to bring suits on their behalf." *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991). While the Sixth Circuit has not yet directly addressed this question, other courts of appeals have held that the conveyance of a "bare right to sue" is insufficient to convey standing for copyright infringement. *See, e.g.*, *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394 (2d Cir. 2018); *Silvers v. Sony Pictures Entertainment, Inc.*, 402 F.3d 881 (9th Cir. 2005). In *John Wiley*, the Second Circuit closely analyzed the text of the Copyright Act and concluded that courts should not "inject an additional untethered right to sue" into the exclusive rights granted by § 106. *John Wiley*, 882 F.3d at 406. The Ninth Circuit has likewise stated that "the right to sue is not an exclusive right" under the Copyright Act. *Silvers*, 402 F.3d at 884; *see also ABKCO Music*, 944 F.2d at 980 (noting that an "assignee is only entitled to bring actions for infringements that were committed while it was the copyright owner and the assignor retains the right to bring actions accruing during its ownership of the right, even if the actions are brought subsequent to the assignment").

The Agreement between Joe Hand and Showtime purportedly grants an exclusive right—the exclusive right to perform the broadcast live on the date of the Event. It further grants the right to initiate enforcement actions for the violation of the exclusive right. (Doc. 52, at 2.) Lesley and Griffith, however, identify a troublesome wrinkle: the Agreement was not executed

until November 2017, three months after the Event. Consequently, while the Agreement does not convey an "untethered" or "bare" right to sue, it is no more than a thinly-veiled attempt to evade the carefully drawn congressional boundaries delineating the right to sue for copyright infringement. *See* 17 U.S.C. § 501(b); *see also Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1169 (9th Cir. 2013) (holding that assignments for the purposes of prosecuting infringement suits "after the alleged infringements occurred, but before [plaintiff] filed [the] suits" was insufficient to confer standing under the Copyright Act, even after the parties executed a subsequent agreement indicating that the assignment "convey[ed] all ownership rights in" the works); *HyperQuest, Inc. v. N'Site Solutions, Inc.*, 632 F.3d 377 (7th Cir. 2011) ("It is the substance of the agreement, not the labels that it uses, that controls our analysis.").

The exclusive right to perform the Event live is utterly meaningless once the Event has already occurred, and, thus, can never be performed "live" again. And Showtime did not assign any additional prospective or derivative rights in the Event that allow the Court to reach another conclusion regarding the value of the transfer. *See Righthaven*, 716 F.3d at 1169 ("When determining whether a contract has transferred exclusive rights, we look not just at the labels the parties use but also the substance and effect of the contract."). Even drawing all inferences in favor of Joe Hand, the Court must conclude that this Agreement would, if effectuated, merely enable Joe Hand to prosecute infringement actions and was not intended to convey any meaningful exclusive rights under the Copyright Act.

Had this Agreement been executed prior to the Event, it is quite probable that Joe Hand would be able to maintain this suit. However, the Agreement was executed months after the Event, and, as a result, the Court concludes that the Agreement is a disguised assignment of the right to sue. *See DRK Photo v. McGraw-Hill Global Educ. Holdings, LLC*, 870 F.3d 978, 985

(9th Cir. 2017) ("[T]he purported transfer of legal title coupled with the transfer of accrued claims does not confer standing when the transaction, in substance and effect, merely transfers the right to sue." (internal citations omitted)). The Court is cognizant of the fact that it is rendering the conveyance of the exclusive right to perform the Event live valueless, a disfavored outcome under Tennessee principles of contract interpretation. *See Lovett v. Cole*, 584 S.W.3d 840, 861 (Tenn. Ct. App. 2019) (noting that "the law of contract interpretation militates against interpreting a contract in a way that renders a provision superfluous" (citing *Crossville Med. Oncology, P.C. v. Glenwood Sys., LLC*, 610 Fed. App'x 464, 468 (6th Cir. 2015))). However, allowing Joe Hand to maintain this suit would ignore the plain language of the Copyright Act and would invite parties to frustrate Congress's intent with mere clever drafting, no matter how metaphysically impossible it is to retroactively obtain an exclusive right to something that could only have existed in the past: the right to display the Event "live." Lesley and Griffith are correct: there is absolutely no evidence that Joe Hand owned an exclusive right at the time of the infringement on August 26, 2017. Therefore, it cannot maintain this action for infringement against Lesley and Griffith. 17 U.S.C. § 501(b). There is nothing left for a jury to determine. *See Planters Gin*, 78 S.W.3d at 890 (after a court "decid[es] the legal effect of the words, there is no genuine factual question left for the jury to decide."). Therefore, the Court **GRANTS** Lesley and Griffith's motion for summary judgment (Doc. 41) and **DENIES** Joe Hand's motion for partial summary judgment (Doc. 39). Because the Court denies Joe Hand's motion for summary judgment, it is unnecessary to analyze Defendants' motion for sanctions, as Lesley and Griffith seek only the exclusion of certain evidence as a sanction.

## IV. CONCLUSION

For the foregoing reasons:

1. Defendants' motion for sanctions (Doc. 48) is **DENIED**.

2. Defendants' motion for summary judgment (Doc. 41) is **GRANTED**.

3. Plaintiff's motion for partial summary judgment (Doc. 39) is **DENIED**.

**AN APPROPRIATE JUDGMENT SHALL ENTER.**

**/s/ *Travis R. McDonough***
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**