**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

|   |   |   |
|---|---|---|
| Deborah S. Hunt | 100 EAST FIFTH STREET, ROOM 540 | Tel. (513) 564-7000 |
| Clerk | POTTER STEWART U.S. COURTHOUSE | www.ca6.uscourts.gov |
|   | CINCINNATI, OHIO 45202-3988 |   |

Filed:  September 21, 2022

Mr. John T.D. Bathke
Mr. Jonathan L.A. Phillips
Phillips & Bathke
4541 N. Prospect Road. Suite 300 A
Peoria, IL 61616

Mr. Jamie King
P.O. Box 5757
Kingwood, TX 77325

Mr. Brian Leigh Yoakum
Evans Petree
1715 Aaron Brenner Drive, Suite 800
Memphis, TN 38120

Re:  Case No. 21-6088*, Joe Hand Promotions, Inc. v. Griffith, et al*
Originating Case No. : 3:20-cv-00382

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Laurie A Weitendorf
Deputy Clerk

cc:  Ms. LeAnna Wilson

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0217p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JOE HAND PROMOTIONS, INC.,

*Plaintiff-Appellant*,

*v.*

JAMES H. GRIFFITH, JR., dba CJ's Sports Bar; LISA LESLEY,

*Defendants-Appellees*.

No. 21-6088

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:20-cv-00382—Travis Randall McDonough, District Judge.

Argued:  August 10, 2022

Decided and Filed:  September 21, 2022

Before:  CLAY, ROGERS, and STRANCH, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Jamie King, JAMIE KING, P.C., Kingwood, Texas, for Appellant.  John T.D. Bathke, PHILLIPS & BATHKE, P.C., Chicago, Illinois, for Appellees.  **ON BRIEF:**  Brian L. Yoakum, EVANS PETREE, PC, Memphis, Tennessee, for Appellant.  John T.D. Bathke, PHILLIPS & BATHKE, P.C., Chicago, Illinois, Jonathan LA Phillips, PHILLIPS & BATHKE, P.C., Peoria Heights, Illinois, for Appellees.

_____

## OPINION

_____

CLAY, Circuit Judge.  Plaintiff Joe Hand Promotions, Inc. ("JHP") appeals the district court's grant of summary judgment in favor of Defendants James H. Griffith and Lisa Lesley (collectively, "Defendants") in this copyright infringement suit brought under the Copyright Act,

17 U.S.C. §§ 106, 501.  *See Joe Hand Promotions, Inc. v. Griffith*, No. 20-cv-382, 2021 WL 4899466, at \*5 (E.D. Tenn. Oct. 21, 2021).  For the reasons set forth below, we **REVERSE** the district court's order granting Defendants' motion for summary judgment and **REMAND** with instructions to grant Plaintiff's motion for partial summary judgment as to copyright standing and for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.  Factual Background

On August 26, 2017, a world famous boxer, Floyd Mayweather, and a famous mixed martial arts fighter, Conor McGregor, entered the ring to face one another in what has become one of the most legendary fights of all time ("the Fight").  *See* John Eligon & Victor Mather, *Mayweather v. McGregor:  Highlights From Every Round*, N.Y. Times, Aug. 26, 2017. Showtime, Inc. produced the Fight, and it allowed individual viewers to livestream the Fight from Showtime's website.  *Joe Hand Promotions, Inc.*, 2021 WL 4899466, at \*1.  Showtime charged individuals $99.99 for these personal use licenses (*i.e.*, to watch the Fight on a personal device in a non-commercial setting).  Showtime also partnered with event promoters to issue commercial streaming licenses to public establishments (*i.e.*, bars, movie theaters, and restaurants).  On June 20, 2017, Showtime contracted with Mayweather Promotions, LLC ("Mayweather") to "arrange for, present and promote" the Fight on August 26, 2017. (Distribution Agreement, R. 40-4, Page ID #348.)  In this contract (the "Distribution Agreement"), Showtime "grant[ed] to [Mayweather] exclusively, the right to exhibit and distribute, and authorize the exhibition and distribution of, the [Fight] in the Territory live via the Internet."  (*Id.* at Page ID #357.)  Defendants erroneously denied the existence of this contract between Showtime and Mayweather.  (*See* Defs. Br. at 14 ("[T]here are no agreements in the record between Showtime and [Mayweather].").)[1]

Mayweather, in turn, enlisted smaller distributors to go out and issue commercial licenses and collect fees.  JHP was one of these distributors.  On August 1, 2017, JHP entered into a

---

[1]Defendants filed a motion following oral argument seeking to rescind their contention that this agreement did not exist.

Commercial Licensing Agreement with Mayweather.  In that contract, Mayweather gave JHP "the sole and exclusive third party license . . . to distribute . . . and authorize the public exhibition of the [Fight]" in a designated geographic area.  (*Id.*)  Accordingly, in the weeks leading up to the Fight, JHP promoted the event, sold commercial licenses to broadcast the event at bars and restaurants, and collected fees from those establishments.  JHP charged hefty commercial licensing fees to air the Fight, ranging from $3,700 to $15,700 based on the establishment's occupancy limits.

The Fight was not registered as a copyrighted work when it first aired on August 26, 2017.  Around two months later, Showtime applied to register its copyright in the Fight, which the United States Copyright Office issued on October 26, 2017 (the "Copyright Registration").  The Copyright Registration listed Showtime as the sole author and claimant of the copyright.  On November 21, 2017, three months after the Fight but less than a month after the Copyright Registration, Showtime signed a contract with JHP (the "Copyright Agreement").  Although not a party to the Copyright Agreement, Mayweather also signed the agreement.  The Copyright Agreement gave JHP "the exclusive right to distribute and publicly perform the [Fight] live on August 26, 2017."  (Copyright Agreement, R. 40-2, Page ID #262.)  It further gave JHP "the exclusive right . . . to take enforcement actions with respect to any unauthorized exploitation of the Commercial Rights in the [Fight]."  (*Id.*)  Specifically, Showtime gave JHP "the right and standing, as exclusive assignee, to assert independent claims, solely in the name of JH[P], for copyright infringement under the copyright laws of the United States . . . solely relating to the unauthorized exploitation of the Commercial Rights in the [Fight]."  (*Id.* at Page ID #263.)  That is, Showtime gave JHP the exclusive right to sue anyone who livestreamed the Fight on August 26, 2017, without paying the required licensing fee.  Accordingly, JHP began suing several restaurants and bars that aired the Fight without paying. *See, e.g.*, *Joe Hand Promotions*, 2021 WL 4899466, at *1.

At this stage, Defendants do not dispute that they livestreamed the Fight on August 26, 2017, on a TV screen at their bar, CJ's Bar & Grill ("CJ's"), without purchasing a commercial license.  As a commercial establishment, CJ's was required to pay a fee based on its occupancy limits in order to legally air the Fight on the bar's TVs.  Rather than pay for a

No. 21-6088                *Joe Hand Promotions, Inc. v. Griffith*                Page 4

commercial license, Defendants paid around $99 for a personal license using Showtime's website. Defendants then used an HDMI cable to connect a personal device to the TV at CJ's and broadcast the Fight throughout the bar. Defendants advertised the event on CJ's Facebook page, and they charged patrons $6 for entry to the bar to watch the Fight.

### B. Procedural Background

After discovering that Defendants livestreamed the Fight without paying for a commercial license, JHP sued them for copyright infringement under the Copyright Act, 17 U.S.C. §§ 106, 501.[2] After discovery, the parties filed cross motions for summary judgment. The district court granted Defendants' motion after finding that JHP did not own the copyright to the Fight on the day it aired. *See Joe Hand Promotions*, 2021 WL 4899466, at *2. The district court found that the Copyright Agreement between Showtime purported to give JHP an exclusive right in the copyrighted work retroactively. *See id.* at *5. However, the district court concluded that such retroactive transfers were essentially worthless. *See id.* It therefore concluded that the Copyright Agreement merely gave JHP the right to sue for past copyright infringement. *See id.* at *4–*5. According to the district court, to have a cause of action under Copyright Act, plaintiffs must own some exclusive right beyond the right to sue. *Id.* at *4 (citing *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394 (2d Cir. 2018)). Believing that Showtime merely gave JHP a right to sue, the district court concluded that JHP did not have a cause of action for copyright infringement because it "did not own the copyright to the [Fight] when it was displayed at [CJ's]." *Id.* at *2. The court therefore granted Defendants' motion for summary judgment. *Id.* at *5. JHP timely appealed and this Court heard oral arguments on August 10, 2022.

## II. DISCUSSION

### A. Standard of Review

"The Court reviews a district court's grant of summary judgment de novo." *Clabo v. Johnson & Johnson Health Care Sys., Inc.*, 982 F.3d 989, 992 (6th Cir. 2020) (citing

---

[2]JHP also brought a claim for internet piracy under the Communications Act of 1934, 47 U.S.C. §§ 553, 605. This claim was dismissed by the district court before summary judgment, and it is not at issue in this appeal. *See Joe Hand Promotions*, 2021 WL 4899466, at *2.

*Rocheleau v. Elder Living Const., LLC*, 814 F.3d 398, 400 (6th Cir. 2016)).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute of a material fact is genuine so long as 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"  *Kirilenko-Ison v. Bd. of Edu. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (quoting *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016)).

### B.  Analysis

The issue in this appeal is whether JHP has a cause of action against Defendants for livestreaming the Fight without a commercial license.  The Copyright Act creates a federal cause of action for copyright infringement.  *See* 17 U.S.C. § 501.  It provides that "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right."  *Id.* § 501(b).  Therefore, to sue Defendants for copyright infringement, JHP must own some interest in the copyright.  *See Bridgeport Music. v. WM Music Corp.*, 508 F.3d 394, 398 (6th Cir. 2007) ("Copyright infringement has two elements:  '(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original.'" (quoting *Stromback v. New Line Cinema*, 384 F.3d 283, 293 (6th Cir. 2004))).

The author of a protected work is considered the original owner of a copyright.  17 U.S.C. § 201(a).  The owner holds certain "exclusive rights" in the work.  *Id.* § 106.  Those "exclusive rights" are listed in § 106 of the Copyright Act, and they include the right to reproduce, distribute, perform, and display the work.  *Id.*  There is some dispute over whether the list of exclusive rights extends beyond those enumerated in § 106.  Relevant to this appeal, the Second and Ninth Circuits have held that possessing a bare right to sue, without any additional exclusive right, does not amount to ownership of a copyrighted work.  *See John Wiley*, 882 F.3d at 410 ("[T]he [Copyright] Act does not permit a plaintiff assignee to bring a claim for infringement without also having or having had a legal or beneficial ownership in some exclusive right under part of the allegedly infringed copyright."); *Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 883 (9th Cir. 2005) (same).  This Court has not weighed in on this issue.

The exclusive rights in a copyrighted work are freely alienable.  "[T]he ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law."  17 U.S.C. § 201(d)(1).  Each exclusive right can be transferred individually, and each right can be further subdivided and owned separately by different parties.  *Id.* § 201(d)(1)–(2); *see also id.* § 101 (defining "[c]opyright owner" as "the owner of that *particular* right" (emphasis added)).  Owners may transfer their exclusive rights "by any means of conveyance" including by assigning the right to a third party or by giving that party an exclusive license.  *Id.* § 201(d)(1); *see also id.* § 101 (defining "transfer of copyright ownership").  "The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title," including the right to sue for infringement of the owner's rights.  *Id.* §§ 201(d)(2), 501(b).

Thus, copyright ownership operates like the common analogy of a bundle of sticks.  The author, as the original owner, holds all of the exclusive rights in the protected work.  *Id.* § 106, 201.  The author may transfer any one of these sticks, in whole or in part, to a third party.  *Id.* § 201(d)(1).  Anyone holding a stick, or a part of a stick, can sue anyone who infringes on that right.  For example, anyone holding a right to distribute a copyrighted work in California can sue infringers in California, but not in New York.  The right to enforce is only as broad as the exclusive right held.

In addition to the ownership requirement, the Copyright Act includes a few other limitations on who can sue for copyright infringement.  It limits the right to sue to those who owned the exclusive right at the time of the infringement.  17 U.S.C. § 501(b).  It also provides that "no civil action for infringement of the copyright . . . shall be instituted until preregistration or registration of the copyright claim has been made" with the United States Copyright Office.  *Id.* § 411(a).  Therefore, the default rule is that only those who owned an exclusive right in a registered copyright at the time of the infringement may bring suit.

However, the Copyright Act extends special treatment to live broadcasts.  *See id.* § 411(c). When the copyrighted work "consist[s] of sounds, images, or both, the first fixation of which is made simultaneously with its transmission"—that is, when the copyrighted work is a broadcast of a live event—then the Copyright Act allows an owner to sue for infringement of an

unregistered copyright so long as the owner registers the copyright within three months of the live broadcast. *See id.*; *see Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 888 (2019). Stated differently, although copyright registration is ordinarily a requirement to bring suit, "[s]uch registration is not a condition of copyright *protection*." 17 U.S.C. § 408(a) (emphasis added). Rather, as the Supreme Court has described it, the registration requirement "is akin to an administrative exhaustion requirement that the owner must satisfy before suing to enforce ownership rights." *Fourth Estate*, 139 S. Ct. at 888.

With this legal framework in mind, we turn to the question now before us: did the November 21, 2017, Copyright Agreement between Showtime and JHP give JHP the right to sue for copyright infringements occurring on August 26, 2017. We conclude that it did.

Defendants argue that JHP did not own any exclusive rights in the Fight on the day it aired. They recognize that the Copyright Agreement purportedly transferred "the exclusive right to distribute and publicly perform" the Fight live on August 26, 2017. (Copyright Agreement, R.40-2, Page ID #262.) But they argue that this exclusive right was, in effect, illusory because the Fight had already aired by the time Showtime and JHP entered into the Copyright Agreement. Because these exclusive rights were illusory, Defendants argue that the Copyright Agreement merely gave JHP a bare right to sue. Pointing to case law from the Second and Ninth Circuits, Defendants conclude that JHP does not have a cause of action under the Copyright Act because the bare right to sue is insufficient give JHP ownership of an exclusive right.

In response, JHP argues that the plain language of the Copyright Agreement retroactively gave JHP exclusive rights in the live broadcast on August 26, 2017. To the extent that the language of the Copyright Agreement is unclear, it argues that Showtime intended to retroactively give JHP the exclusive right to distribute the Fight on the day it aired as well as the right to sue violators for copyright infringement. As evidence of this intent, JHP points to the Commercial Licensing Agreement between Mayweather and JHP on August 1, 2017. JHP does not have much to say about whether the Copyright Act allows such a retroactive transfer of exclusive rights.

No. 21-6088                     *Joe Hand Promotions, Inc. v. Griffith*                     Page 8

These arguments touch on complicated questions of copyright law including when copyright protection in a live broadcast first arises, whether or how an author may transfer exclusive rights in a live event before registering a copyright, and whether an author can retroactively transfer exclusive rights. However, we do not need to get into these issues to resolve this case. We conclude that the Copyright Agreement gave JHP an enforceable right to sue Defendants because it formalized a series of earlier agreements under which JHP went about exclusively licensing and distributing the Fight to commercial establishments in a specific region *before* the Fight aired.

The earlier agreements between Showtime, Mayweather, and JHP gave JHP an exclusive license to distribute the streaming rights to commercial establishments to air the Fight *live* on August 26, 2017. On June 20, 2017, Showtime and Mayweather signed the Distribution Agreement. In that agreement, Showtime "grant[ed] to [Mayweather] exclusively, the right to exhibit and distribute, and authorize the exhibition and distribution of, the [Fight] in the Territory live via the Internet." (Distribution Agreement, R. 40-4, Page ID #357.) The Distribution Agreement thus gave Mayweather one of Showtime's sticks from its bundle, making Mayweather an "owner" under the Copyright Act. *See* 17 U.S.C. §§ 106(3)–(4), 201(d), 204. Admittedly, at this point, the Fight had not happened, and Showtime did not hold a registered copyright. But copyright protection can arise before registration, *see Fourth Estate*, 139 S. Ct. at 887–88, and nothing prevented Showtime from transferring some of the sticks in its bundle in anticipation of the Fight, even before applying for a copyright registration. In this case, Showtime did just that by giving exclusive rights to Mayweather in the Distribution Agreement. Mayweather turned around and transferred those sticks (or parts of those sticks) to JHP. On August 1, 2017, JHP and Mayweather signed the Commercial Licensing Agreement.[3] In that

---

[3]Defendants argue that JHP forfeited any argument using the Commercial Licensing Agreement as evidence of Showtime and JHP's intent when signing the Copyright Agreement. Specifically, they claim that "JHP did not make any argument concerning the [Commercial Licensing] Agreement in either its own motion for summary judgment or in its response to [Defendants'] motion for summary judgment, which is the subject of this appeal." (Defs. Br. at 8–9.) But JHP's motion for summary judgment *did* point to the Commercial Licensing Agreement as evidence that it held an exclusive right on the day of the Fight. JHP specifically noted that: "Through an agreement with the promoters of the Event,"—*i.e.*, the August 1, 2017, Commercial Licensing Agreement with Mayweather—"[JHP] was licensed to exhibit the Event at commercial locations, such as bars, restaurants, clubs, lounges, and other commercial establishments throughout the State of Tennessee." (Pl. Mot. Summ. J., R. 40, Page

contract, Mayweather gave JHP "the sole and exclusive third party license . . . to distribute . . . and authorize the public exhibition of the [Fight]" in a designated geographic area.  (Commercial Licensing Agreement, R. 40-2, Page ID #247.)   This contract explicitly stated that it was transferring JHP an exclusive right as defined in the Copyright Act, stating that "JHP holds the right to authorize the exhibition of the [Fight] publicly *within the meaning of 17 U.S.C. § 106(4), (5)*."   (*Id.* at Page ID #251 (emphasis added).)   That statutory provision defines "exclusive rights" as including the rights to display and perform the work publicly.  17 U.S.C. § 106(4)–(5).

In the lead up to the Fight, even without the benefit of a registered copyright, these three entities—Showtime, Mayweather, and JHP—went about carving out their respective rights. These rights, including the exclusive right to distribute the Fight to commercial establishments, were outlined in the Distribution Agreement and the Commercial Licensing Agreement, both of which took effect *before* the Fight aired on August 26, 2017.  However, the question remains whether the November 21, 2017, Copyright Agreement was intended to bestow some new and additional right to JHP, or whether it merely reiterated and reaffirmed the parties' understandings of their preexisting rights with the added benefit of a newly registered copyright.  The Copyright Agreement does not expressly answer this question.  Nowhere does it state that it intended to formalize existing arrangements, nor does it mention the Distribution Agreement or the Commercial Licensing Agreement.  However, the earlier agreements provide necessary context for the Copyright Agreement.  *See Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 694 (Tenn. 2019).[4]   And, because none of these agreements conflict with one another, we may turn to them to discern Showtime and JHP's intent when entering into the later Copyright Agreement.  *See id.* at 696.  Viewing these agreements together, the Copyright Agreement merely intended to reiterate that JHP's existing exclusive license in the live Fight remained intact even in the wake of Showtime's formal Copyright Registration.

---

ID #204.)  Accordingly, Defendants' forfeiture arguments are without merit.  *See Bard v. Brown Cnty.*, 970 F.3d 738, 749 (6th Cir. 2020) (quoting *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009)).

[4]The parties agree that Tennessee's principles of contract law govern the interpretation of the Copyright Agreement.

Unlike the extensive terms and conditions found in the earlier Distribution Agreement and Commercial Licensing Agreement, which numbered 36 and 15 pages respectively, the Copyright Agreement was barely three pages long. Outside of the definitions and some boilerplate provisions, it had two substantive provisions which provided that: (1) "JH[P] has been granted the sole and exclusive Commercial Rights . . . in the Territory in the [Fight], under the copyright laws of the United States" with Commercial Rights defined as the "exclusive right to distribute and publicly perform the [Fight] live on August 26, 2017 to Commercial Premises in the Territory;" and (2) "JH[P] has the exclusive right in the Territory to take enforcement measures" in connection with its exclusive rights in the distribution of commercial licenses. (Copyright Agreement, R. 40-2, Page ID #262.) The first provision mirrors the exclusive license that Showtime gave to Mayweather, and that Mayweather then gave JHP, *before* the Fight. Although Showtime and JHP were the only parties to the Copyright Agreement, they nonetheless had Mayweather sign and say that it accepted and agreed to the terms therein.

We conclude that, by using a barebone contract signed by all of the parties involved in the days leading up to the Fight, it is clear that Showtime and JHP intended the Copyright Agreement to formalize existing rights in the wake of Showtime's newly obtained Copyright Registration. In effect, everyone involved came together after the Copyright Registration and concluded, in the Copyright Agreement, that the new registration did not change anything. The status of the copyright may have changed on October 26, 2017, but the nature of the exclusive rights and interests of these three parties remained untouched. If the Copyright Agreement was an entirely new transfer of rights from Showtime to JHP, there would be no need for Mayweather to agree. The Copyright Agreement only makes sense as an extension of the earlier agreements.

Defendants' position is seemingly that the Copyright Agreement was a standalone transfer of rights wholly apart from the earlier agreements. They argue that the Copyright Agreement was, in essence, a sham because it purported to transfer an exclusive right in a live event that had already happened. The district court agreed. *See Joe Hand Promotions*, 2021 WL 4899466, at *5 ("The exclusive right to perform the [Fight] live is utterly meaningless once the [Fight] has already occurred, and, thus, can never be performed 'live' again."). But the

Copyright Registration listed Showtime as the sole author and claimant of the copyrighted work, and copyright ownership "vests initially in the author . . . of the work." 17 U.S.C. § 201(a). If the Copyright Registration could be interpreted as returning all of the exclusive rights back to the author of the Fight (Showtime), then the Copyright Agreement clarified that the new registration did not alter JHP's preexisting exclusive license to distribute the Fight to commercial establishments within its geographic zone.

Because we conclude that the Copyright Agreement merely reiterated the existing distribution of rights, we need not reach the bulk of the parties' arguments. The parties focus on whether the Copyright Agreement could legally transfer an exclusive right retroactively. Even if such a retroactive transfer could theoretically be legally valid, Defendants argue that the Copyright Agreement, as a factual matter, was not intended to be retroactive. Because the Copyright Agreement merely codified earlier transfers in the wake of the *post hoc* Copyright Registration, there is no retroactivity issue. By extension, we need not address Defendants' arguments that the Copyright Agreement gave JHP a bare right to sue, which they claim is at odds with the Second and Ninth Circuits' interpretation of the Copyright Act. The Copyright Agreement simply reaffirmed that JHP held an exclusive right to distribute the Fight to commercial establishments in advance of the live Fight. Even though the Copyright Agreement was signed at a later date, JHP acted as though it held the exclusive right well in advance of the Fight. Indeed, it advertised the Fight, distributed the livestream, and collected fees from commercial establishments that wanted to air the Fight live. By viewing the Copyright Agreement in a vacuum and ignoring the parties' earlier agreements and conduct, Defendants ignore Showtime and JHP's intent when entering the contract.

In sum, JHP owned the exclusive right to distribute and publicly display the Fight on the day it aired, August 26, 2017. The copyright was registered within three months of the alleged infringement, as required to sue for copyright infringements in live telecasts. 17 U.S.C. § 411(c). Accordingly, JHP has a cause of action against anyone who violated its exclusive rights on the day of the Fight, including Defendants. *See id.* § 501(b).

### III.  CONCLUSION

For these reasons, we **REVERSE** the district court's order granting Defendants' motion for summary judgment and **REMAND** with instructions to grant Plaintiff's motion for partial summary judgment on the issue of copyright standing and for further proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 21-6088

JOE HAND PROMOTIONS, INC.,

    Plaintiff - Appellant,

    v.

JAMES H. GRIFFITH, JR., dba CJ's Sports Bar;
LISA LESLEY,

    Defendants - Appellees.

```
┌─────────────────────────────┐
│           FILED             │
│        Sep 21, 2022         │
│    DEBORAH S. HUNT, Clerk    │
└─────────────────────────────┘
```

Before:  CLAY, ROGERS, and STRANCH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is REVERSED and REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk